Jose Luis Muñoz
NAME
# AX4543
PRISON IDENTIFICATION/BOOKING NO.
High Desert State Prison
ADDRESS OR PLACE OF CONFINEMENT
P.O Box 3030
Susanville, CA. 96127

Note: It is your responsibility to notify the Clerk of Court in writing of any change of address. If represented by an attorney, provide his or her name, address, telephone and facsimile numbers, and e-mail address.

Fee Due

FILED
CLERK, U.S. DISTRICT COURT
DEC 10 2019
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

Jose Luis Muñoz
FULL NAME (*Include name under which you were convicted*)

Petitioner,

v.

J. Pickeet, Acting Warden
NAME OF WARDEN, SUPERINTENDENT, JAILOR, OR AUTHORIZED PERSON HAVING CUSTODY OF PETITIONER

Respondent.

CASE NUMBER:
CV CV19-10439- MWF (GJS)
To be supplied by the Clerk of the United States District Court

☐ ________________ AMENDED

**PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**
**28 U.S.C. § 2254**

PLACE/COUNTY OF CONVICTION ________________
PREVIOUSLY FILED, RELATED CASES IN THIS DISTRICT COURT (*List by case number* )
CV ________________
CV ________________

**INSTRUCTIONS - PLEASE READ CAREFULLY**

1. To use this form, you must be a person who either is currently serving a sentence under a judgment against you in a California state court, or will be serving a sentence in the future under a judgment against you in a California state court. You are asking for relief from the conviction and/or the sentence. This form is your petition for relief.

2. In this petition, you may challenge the judgment entered by only one California state court. If you want to challenge judgments entered by more than one California state court, you must file a separate petition for each court.

3. Make sure the form is typed or neatly handwritten. You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

4. Answer all the questions. You do not need to cite case law, but you do need to state the federal legal theory and operative facts in support of each ground. You may submit additional pages if necessary. If you do not fill out the form properly, you will be asked to submit additional or correct information. If you want to submit a legal brief or arguments, you may attach a separate memorandum.

5. You must include in this petition all the grounds for relief from the conviction and/or sentence that you challenge. You must also state the facts that support each ground. If you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.

6. You must pay a fee of $5.00. If the fee is paid, your petition will be filed. If you cannot afford the fee, you may ask to proceed *in forma pauperis* (as a poor person). To do that, you must fill out and sign the declaration of the last two pages of the form. Also, you must have an authorized officer at the penal institution complete the certificate as to the amount of money and securities on deposit to your credit in any account at the institution. If your prison account exceeds $25.00, you must pay the filing fee.

7. When you have completed the form, send the original and two copies to the following address:

Clerk of the United States District Court for the Central District of California
United States Courthouse
ATTN: Intake/Docket Section
255 East Temple Street, Suite TS-134
Los Angeles, California 90012

LODGED
CLERK, U.S. DISTRICT COURT
DEC - 6 2019
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

PLEASE COMPLETE THE FOLLOWING (*check appropriate number*):

This petition concerns:
1. ☒ a conviction and/or sentence.
2. ☐ prison discipline.
3. ☐ a parole problem.
4. ☐ other.

## PETITION

1. Venue
   a. Place of detention High Desert State Prison
   b. Place of conviction and sentence Los Angeles County Superior Court

2. Conviction on which the petition is based *(a separate petition must be filed for each conviction being attacked).*
   a. Nature of offenses involved *(include all counts)*: Count 1 Muder in the first Degree, Count 3, Assault with a Deadly weapon
   b. Penal or other code section or sections: Count 1, Penal Code 187, P.C 12022.53 (d) Count 3, Penal code 245 (a) (1), P.C. 12022.7 (a), P.C 186.22 (b) (1)
   c. Case number: BA387718
   d. Date of conviction: 4-16-2015
   e. Date of sentence: 7-24-2015
   f. Length of sentence on each count: Count 1, 75 years to life, Count 3, 12 years consecutive
   g. Plea *(check one)*:
      ☒ Not guilty
      ☐ Guilty
      ☐ Nolo contendere
   h. Kind of trial *(check one)*:
      ☒ Jury
      ☐ Judge only

3. Did you appeal to the California Court of Appeal from the judgment of conviction? ☒ Yes ☐ No
   If so, give the following information for your appeal *(and attach a copy of the Court of Appeal decision if available)*:
   a. Case number: B265901
   b. Grounds raised *(list each)*: The Trial court ERRed in Refusing To Allow Testmony Expert on "Flight or Fight" syndrome And PTSD, ThereBy Denying Appellant,
      (1) The Right To Present a complete Defense of Defense of others.
      (2) To The Extent it was Necessarary To Request Instruction on Antecendent Threats Defense counsel was Ineffected for Falling To Do so, TherBy Depriving Appellant of Ability To Present a complete Defense,

It was ERRor To Fail To Instruct SuA sponte on Antecedent As They were
(3) closely And openly connected with The Facts of The case.
(4) The court ERRed in NOT Instructing on The Lessor Included offense of Heat passion Manslaughter
(5) There was Insufficient Evidence To Support The Finding That The Murder was wilful, Deliberate And Premeditated And That Finding Violated Due process of LAW
(6) The cumulative Effect of The Trial ERRORS Requieres Reversal

c. Date of decision: 6-7-2017

d. Result The court of Appeal Affirmed the conviction

4. If you did appeal, did you also file a Petition for Review with the California Supreme Court of the Court of Appeal decision? ☒ Yes ☐ No

If so, give the following information *(and attach copies of the Petition for Review and the Supreme Court ruling if available)*:

a. Case number: B265901

b. Grounds raised *(list each)*: "The Trial court ERRed In Refusing To Allow TesTmony of Expert on "Flight or Fight" Syndrome And PTSD ThereBy Denying Appellant
(1) The Right To Present a complete Defense of Defense of others.
(2) To The Extent it was Necessary to Request Instruction on Antecedent threats Defense counsel was Ineffected for Falling To Do So, Thereby Depriving Appellant To Present a complete Defense
(3) It was ERRor To fail To Instruct SuA sponte on Antecedent As They were closely And openly connected with The Facts of The case.
(4) The court ERRer in NOT Instructing on The Lessor Included offense of Heat passion Manslaughter
(5) There was Insufficient Evidence To Support The Finding That The Murder was wilful, Deliberated And premeditated And That Finding violated Due process of LAW
(6) The cumulative Effect of Trial ERRors Requieres Reversal.

c. Date of decision: 3-28-2018, granted review under case # S24643

d. Result sent back to appeals court to remand and resentence under S.B 620 to strike the Firearm enchanment

5. If you did not appeal:

a. State your reasons ______

b. Did you seek permission to file a late appeal? ☐ Yes ☒ No

6. Have you previously filed any habeas petitions in any state court with respect to this judgment of conviction?

☐ Yes ☒ No

If so, give the following information for each such petition *(use additional pages, if necessary, and attach copies of the petitions and the rulings on the petitions if available)*:

a. (1) Name of court: ______

(2) Case number: ______

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: ______

(4) Grounds raised *(list each)*:

(a) ______

(b) ______

(c) ______

(d) ______

(e) ______

(f) ______

(5) Date of decision: ______

(6) Result ______

(7) Was an evidentiary hearing held? ☐ Yes ☒ No

b. (1) Name of court: ______

(2) Case number: ______

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: ______

(4) Grounds raised *(list each)*:

(a) ______

(b) ______

(c) ______

(d) ______

(e) ______

(f) ______

(5) Date of decision: ______

(6) Result ______

(7) Was an evidentiary hearing held? ☐ Yes ☒ No

c. (1) Name of court: ______

(2) Case number: ______

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: ______

(4) Grounds raised *(list each)*:

(a) ______

(b) ______

(c) ______

(d) ______

(e) ______

(f) ______

(5) Date of decision: ______

(6) Result ______

(7) Was an evidentiary hearing held? ☐ Yes ☒ No

7. Did you file a petition for certiorari in the United States Supreme Court? ☐ Yes ☒ No

If yes, answer the following:

(1) Docket or case number (if you know): ______

(2) Result: ______

(3) Date of result (if you know): ______

(4) Citation to the case (if you know): ______

8. For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than five grounds. Summarize briefly the facts supporting each ground. For example, if you are claiming ineffective assistance of counsel, you must state facts specifically setting forth what your attorney did or failed to do.

**CAUTION:** *Exhaustion Requirement*: In order to proceed in federal court, you must ordinarily first exhaust your state court remedies with respect to each ground on which you are requesting relief from the federal court. This means that, prior to seeking relief from the federal court, you first must present all of your grounds to the California Supreme Court.

a. Ground one: The Trial court ERRed In Refusing To Allow TesTmony of Expert on "Flight OR FighT" syndrome And PTSD, ThereBy Deneying Appellant The RighT TO Present A complete Defense of Defense of others.

(1) Supporting FACTS: Chambers v. Mississipi, for The Exclusion of Evidence vital To A Defendants defense constitutes a Denial of A fair Trial. [CiTing] People v. Prince (2007) 40 Cal. 4th 1179, 1222; whether Rooted Directly In The Due Process clause of The Fourteenth Amendment or in The compulsory process or confrontation clause of The sixth Amendment The constitution guarantees criminal defedants a meaningful opportunity To Present A complete Defense.

(2) Did you raise this claim on direct appeal to the California Court of Appeal? ☒ Yes ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court? ☒ Yes ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court? ☐ Yes ☒ No

b. Ground two: To The Extent It was Necessary To Request Instruction on Antecendent Threats Defense counsel was Ineffective For Falling To Do So, ThereBy Depriving Appellant of The ABiliTy To Present A complete Defense.

(1) Supporting FACTS: A criminal Defendant Has The RighT To Assitance of counsel under both The federal And state constitution (U.S. Const. 6th Amend; Const. Art I §15) Strickland v. Washington (1984) 466 US 668, 687. An Attorneys failure To procure favorable jury Instruction constitues I.A.C especially when It Results In The Abandoment of A promising Defense. united states v. Span (9th cir. 1996) 75 F.3d 1383, 1390

(2) Did you raise this claim on direct appeal to the California Court of Appeal? ☒ Yes ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court? ☒ Yes ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court? ☐ Yes ☒ No

c. Ground three: It was ERROR To Fail To Instruct suA Sponte on Antecedent Threats As They were closely And openly connected with The Facts of The case.

(1) Supporting FACTS: Fundamental Fairness, as guaranteed by The Sixth Amendment and The Due Process clause of united States constitution requieres That a criminal defendant be afforded a meanful opportunity To Present A complete Defense. (California v. Trombetta (1984) 467 U.S. 479. Jury Instruction Releaving The prosecution of Burden of Proving beyond Reasonable doubt Each Element of The charge offense violates The Defendants Due Process Rights under Federal constitution." People v. Flood (1998) 18 Cal. 4th where substantial Evidence so warrants. Citations "People v. Lucero (1988) 203 Cal. App. 3d. 1011, 1018

(2) Did you raise this claim on direct appeal to the California Court of Appeal? ☒ Yes ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court? ☒ Yes ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court? ☐ Yes ☒ No

d. Ground four: The court ERRed In NoT Instructing on The Lessor Included offense of Heat of Passion Manslaughter.

(1) Supporting FACTS: It is settled law That A court must Instruct suA sponte on A LessoR Included offense, when The Evidence Raises A Question as To Wether All The Elements of The charge are Present. (People v. Barton (1995) 12 Cal. 4th 186, 194-195.) Put Another way a court Must Instruct suA Sponte on A LessoR Included offense If There is substantial Evidence The Defendant is guilty only of The LessoR offense (People v. Birks (1998) 19 Cal. 4th 108. Two Federal circuts have found That ERRoneous Failure To Provide an Instruction on A LessoR Included offense violates The Defendant Rights To Due Process under Fourteeth Amendment To The united states constitution. (Vujosevic v. Rafferty (3rd cir. 1988 Ferazza v. MinTzes (6th cir. 1984.

(2) Did you raise this claim on direct appeal to the California Court of Appeal? ☒ Yes ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court? ☒ Yes ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court? ☐ Yes ☒ No

e. Ground five: There was Inssufficient Evidence To support The Finding That The Murder was willful, Deliberated And Premeditated And That finding violates Due Process of Law

(1) Supporting FACTS: There was Inssufficient evidence supporting The Jurys Finding of wilful, Deliberate and Premeditated Murder, The Finding was In violation of Due process clause of The Fourteeth Amendment And is Invaled For That Reason. Jackson v. Virginia (1979) 443 U.S 307, 313-324) "A California conviction without adequate support separately and Indepently offends and Falls under The Due Process Clause Article I § Section 15" People v. Rowland (1992) 4 Cal. 4th 238, 269

(2) Did you raise this claim on direct appeal to the California Court of Appeal? ☒ Yes ☐ No

(3) Did you raise this claim in a Petition for Review to the California Supreme Court? ☒ Yes ☐ No

(4) Did you raise this claim in a habeas petition to the California Supreme Court? ☐ Yes ☒ No

9. If any of the grounds listed in paragraph 8 were not previously presented to the California Supreme Court, state briefly which grounds were not presented, and give your reasons: ______

10. Have you previously filed any habeas petitions in any federal court with respect to this judgment of conviction?

☐ Yes ☒ No

If so, give the following information for each such petition *(use additional pages, if necessary, and attach copies of the petitions and the rulings on the petitions if available)*:

a. (1) Name of court: ______

(2) Case number: ______

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: ______

(4) Grounds raised *(list each)*:

(a) ______

(b) ______

(c) ______

(d) ______

(e) ______

(f) ______

(5) Date of decision: ______

(6) Result ______

(7) Was an evidentiary hearing held? ☐ Yes ☒ No

b. (1) Name of court: ______

(2) Case number: ______

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: ______

(4) Grounds raised *(list each)*:

(a) ______

(b) ______

(c) ______

(d) ______

(e) ______

(f) ______

(5) Date of decision: ______

(6) Result ______________________

(7) Was an evidentiary hearing held? ☐ Yes ☒ No

11. Do you have any petitions now pending (i.e., filed but not yet decided) in any state or federal court with respect to this judgment of conviction? ☐ Yes ☒ No

If so, give the following information *(and attach a copy of the petition if available)*:

(1) Name of court: ______________________

(2) Case number: ______________________

(3) Date filed *(or if mailed, the date the petition was turned over to the prison authorities for mailing)*: ______________________

(4) Grounds raised *(list each)*:

(a) ______________________

(b) ______________________

(c) ______________________

(d) ______________________

(e) ______________________

(f) ______________________

12. Are you presently represented by counsel? ☐ Yes ☒ No

If so, provide name, address and telephone number: ______________________

WHEREFORE, petitioner prays that the Court grant petitioner all relief to which he may be entitled in this proceeding.

______________________
*Signature of Attorney (if any)*

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on 11-28-2019
*Date*

Jose L. Mirna
*Signature of Petitioner*

Jose Luis Muñoz
*Petitioner*

J. Pickeet, Acting Warden
*Respondent(s)*

**DECLARATION IN SUPPORT OF REQUEST TO PROCEED *IN FORMA PAUPERIS***

I, Jose Luis Muñoz, declare that I am the petitioner in the above entitled case; that in support of my motion to proceed without being required to prepay fees, costs or give security therefor, I state that because of my poverty I am unable to pay the costs of said proceeding or to give security therefor; that I believe I am entitled to relief.

1. Are you presently employed? ☐ Yes ☒ No

   a. If the answer is yes, state the amount of your salary or wages per month, and give the name and address of your employer. Ø

   b. If the answer is no, state the date of last employment and the amount of the salary and wages per month which you received. ______

2. Have you received, within the past twelve months, any money from any of the following sources?

   a. Business, profession or form of self-employment? ☐ Yes ☒ No
   b. Rent payments, interest or dividends? ☐ Yes ☒ No
   c. Pensions, annuities or life insurance payments? ☐ Yes ☒ No
   d. Gifts or inheritances? ☐ Yes ☒ No
   e. Any other sources? ☐ Yes ☒ No

   If the answer to any of the above is yes, describe each source of money and state the amount received from each during the past twelve months: ______

3. Do you own any cash, or do you have money in a checking or savings account? *(Include any funds in prison accounts)*

   ☐ Yes ☒ No

If the answer is yes, state the total value of the items owned: ______________________

4. Do you own any real estate, stocks, bonds, notes, automobiles, or other valuable property? *(Excluding ordinary household furnishings and clothing)* ☐ Yes ☒ No

If the answer is yes, describe the property and state its approximate value: ______________________

5. List the persons who are dependent upon you for support, state your relationship to those persons, and indicate how much you contribute toward their support: ______________________

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on 11-28-2019 [signature]

*Date* *Signature of Petitioner*

**CERTIFICATE**

I hereby certify that the Petitioner herein has the sum of $ 0.67 on account to his credit at the HDSP institution where he is confined. I further certify that Petitioner likewise has the following securities to his credit according to the records of said institution: High Desert State Prison

11-21-19 [signature] C/O CRUZ-Solis

*Date* *Authorized Officer of Institution/Title of Officer*

Date\Time: 11/21/2019 11:05:39 AM

CDCR

Verified: ______________________

Institution: HDSP

# Inmate Statement Report

| CDCR# | Inmate/Group Name | Institution | Unit | Cell/Bed |
|---|---|---|---|---|
| AX4543 | MUNOZ, JOSE | HDSP | C 006 1 | 119001 |

**Current Available Balance:** $0.67

## Transaction List

| Transaction Date | Institution | Transaction Type | Source Doc# | Receipt#/Check# | Amount | Account Balance |
|---|---|---|---|---|---|---|
| 05/01/2019 | HDSP | BEGINNING BALANCE | | | | $1.17 |
| 10/17/2019 | HDSP | KIOSK REQUEST | | | ($0.50) | $0.67 |

## Encumbrance List

| Encumbrance Type | Transaction Date | Amount |
|---|---|---|

**No information was found for the given criteria.**

## Obligation List

| Obligation Type | Court Case# | Original Owed Balance | Sum of Tx for Date Range for Oblg | Current Balance |
|---|---|---|---|---|

**No information was found for the given criteria.**

## Restitution List

| Restitution | Court Case# | Status | Original Owed Balance | Interest Accrued | Sum of Tx for Date Range for Oblg | Current Balance |
|---|---|---|---|---|---|---|
| RESTITUTION FINE | BA387718 | Active | $10,000.00 | $0.00 | $0.00 | $10,000.00 |
| DIRECT ORDER | BA387718 | Active | $4,498.00 | $0.00 | $0.00 | $4,413.00 |

COURT OF APPEAL – SECOND DIST.
FILED
ELECTRONICALLY
Jul 24, 2018
JOSEPH A. LANE, Clerk
T. JACKSON Deputy Clerk

Filed 7/24/2018

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br>Plaintiff and Respondent,<br>v.<br>JOSE LUIS MUNOZ,<br>Defendant and Appellant. | B265901<br>(Los Angeles County Super. Ct. No. BA387718) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ronald S. Coen, Judge. Affirmed and remanded.

John A. Colucci, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Margaret E. Maxwell, Supervising Deputy Attorney General, William H. Shin, Deputy Attorney General, for Plaintiff and Respondent.

It is undisputed that defendant and appellant Jose Luis Munoz (defendant) shot and killed Willie Thornton (Thornton) early one morning outside defendant's home. The issue at trial was why. Defendant presented evidence he killed Thornton in order to protect his mother and himself. A jury found otherwise and convicted defendant of first degree murder. We issued an opinion rejecting defendant's contentions of error, including claims that the trial court abused its discretion in excluding expert testimony on "fight or flight" syndrome and the trial court should have instructed the jury on whether and how the jury could consider "antecedent threats" that defendant claimed influenced his decision to kill Thornton. At our Supreme Court's direction, we vacate that opinion and issue a new opinion that reaches the same conclusions and addresses a sentencing issue raised only in defendant's petition for review after we issued our prior opinion.

## BACKGROUND

### A. *Procedural History*

The Los Angeles County District Attorney charged defendant in a second amended information with murder (Pen. Code, § 187, subd. (a)),[1] second degree robbery (§ 211), and assault by means likely to produce great bodily injury (§ 245, subd. (a)(1)), based on events that occurred in August 2011. The District Attorney further alleged defendant committed all three offenses for the benefit of, at the direction of, and in association with a criminal street gang within the meaning of section 186.22,

---

[1] Undesignated statutory references that follow are to the Penal Code.

subdivision (b)(1). Other sentencing enhancements were also alleged.

In 2013, defendant went to trial on the three charges against him. The jury could not reach a unanimous verdict on any of the charges, and the judge declared a mistrial.

Defendant was retried on all three counts in 2015.[2] The jury found him guilty of first degree murder (count one) and assault (count three). It found him not guilty of robbery (count two). The jury found the gang allegation true as to the assault charge but not true with respect to the murder.

The court sentenced defendant to 75 years to life on the murder conviction: 25 years to life for first degree murder, doubled on account of a prior "strike" conviction, plus another 25 years to life for a section 12022.53, subdivision (d) gun enhancement found true. The court sentenced defendant to an additional, consecutive 12 years in prison for the assault conviction and related enhancements.

### *B. The Evidence at Trial*

#### *1. Defendant's gang membership*

Defendant admitted to police officers in past interactions that he was a member of the 18th Street gang and went by the name "Diablo." He had numerous tattoos associated with 18th Street, although he had removed some from his neck and chin in

---

[2] Different judges presided over the 2013 and 2015 trials, but the same attorney represented defendant in both.

recent years. Defendant also had the letters "BK," which stood for "Blood killer," tattooed on his abdomen.[3]

2. *Assault of Timothy Smith*[4]

On August 8, 2011, Timothy Smith (Smith), a young African-American man, was walking to a liquor store with his girlfriend's uncle in Los Angeles. Two men pulled up in a truck alongside the pair, and defendant, whom Smith had never seen before, exited the vehicle. Defendant said "West Side 18th Street," identified himself as "Diablo," and asked Smith where he was from. Smith responded he "didn't bang" and then asked defendant, "what's up?" Defendant threw a punch at Smith and the men began to fight. After Smith fell to the ground, defendant and his associate stomped on Smith's head and ribs.

Smith received seven staples and three stitches to close a wound on his head. When Smith spoke to the police, he told them his attacker said his name was "Diablo" and that he was a member of 18th Street. About two weeks later, a police detective showed Smith a "six-pack" photo array, and Smith identified defendant as his attacker.

---

[3] The prosecution's gang expert, police officer Daniel Garcia, testified the 18th Street gang did not like "Bloods" because they were African-American.

[4] Defendant does not challenge his conviction or sentence for assaulting Timothy Smith. Our discussion of the facts of the assault is accordingly brief.

*3. Fight with an unidentified Hispanic man*

Defendant lived on the 2700 block of Exposition Place in Los Angeles. The property consisted of a main house in front, where his mother, Maria Pena (Pena), and two teenage siblings resided, and a smaller structure in back, where defendant stayed from time to time. An iron fence ran the length of the property, separating its front yard and driveway from the sidewalk. Train tracks ran behind the property.

Witnesses at trial testified that on the afternoon of August 9, 2011, defendant got into an argument, which escalated into a physical fight, with a Hispanic man who came onto the property. At some point, defendant ran into the front house where his sister was home alone, retrieved a kitchen knife, and returned outside. The two men continued to fight, and defendant stabbed the other man, who left bleeding. A trail of blood, and a tooth, were later discovered outside defendant's home. Defendant ran to his grandparents' house, which was in the 2600 block of Exposition Place on the other side of 7th Avenue; his sister followed several minutes later.

*4. Killing of Willie Thornton*

Jonathan Almache (Almache), who was 14 years old at the time, went to defendant's house on the evening of August 11, 2011. Defendant told Almache he fought with a Hispanic man a couple days earlier and the man had threatened to return and kill him. Defendant showed Almache he was carrying a gun and wearing a bulletproof vest.

Almache spent the night at defendant's house, and defendant asked him to set his cell phone alarm for 4:30 a.m. When the alarm sounded, defendant went outside and positioned

himself behind the front gate of the property. Defendant's next-door neighbor, Estella Mendez (Mendez), was awakened by the sound of a door opening. She looked out her window and saw defendant standing in the patio area in front of the main house, holding a metal object behind his leg. Mendez went back to sleep.

Pena (defendant's mother) customarily parked her Ford Explorer on the street outside the house and left for work each morning around 4:30 a.m. Surveillance video taken from a business in the 2900 block of Exposition Place captured footage of a white Saturn—driven by Thornton—turning from 9th Avenue onto Exposition Place heading east toward defendant's house at approximately 4:34 a.m. The video does not show the stretch of Exposition Place in front of defendant's house, but at some point after passing defendant's house and Pena's car, the Saturn made a u-turn. Pena pulled away from the curb and began driving west on Exposition Place, toward 9th Avenue, before the Saturn passed defendant's house also traveling west.

Defendant, still standing outside, fired two shots at the Saturn as it passed by his house. One bullet struck Thornton in the left side of his forehead, killing him. The other bullet hit the dashboard. After Thornton was shot, the Saturn continued westbound, sideswiping four cars parked along Exposition Place until it came to a stop when it ran into a chain-link fence where Exposition Place runs into 9th Avenue.

When officers arrived shortly after the shooting, a few people had gathered around the Saturn. Thornton was dead inside. Both front seats in the white Saturn were reclined. Thornton's shirt was unbuttoned, his pants were unbuckled, and he was wearing a single sock and no shoes. His hands were "open" and "somewhat down to his knees." On the driver's side

floorboard was one shoe and one sock; on the passenger-side floorboard was the matching shoe and a white cap. There was a pizza box, a beer can, and a black duffel bag with clothes inside behind the front passenger seat. The front driver's side window and both passenger-side windows were shattered, and the front and back seats on the passenger side were covered with glass.

A person near the car handed an officer Thornton's cell phone. Another cell phone, with a broken faceplate and no battery, was found outside, "kind of underneath" the car. The Saturn was registered to a Lionel Griffin and had no license plates. Thornton's wallet contained a California identification card for someone named Leroy Peterson and a Medicare card for a Walter Horton. A sample taken from Thornton's hands showed the presence of metallic particles consistent with gunshot residue.[5]

Thornton, a middle-aged African-American man, lived with his daughter, Desiree, who was 16 or 17 when he was killed. Desiree said Thornton was a housepainter and that they were homeless at the time of his death. She testified that on the night of August 11, 2011, Thornton left Desiree at her brother's house,

---

[5] The criminalist who analyzed the sample testified that a sample "consistent" with gunshot residue meant it contained one or two of the three elements—lead, barium, and antimony—criminalists look for to indicate the presence of gunshot residue. Based on Thornton's sample, the criminalist opined Thornton either "discharged a firearm," "had his hands otherwise in an environment of gunshot residue," or "received these particles from an environmental source." She testified that if a bullet fired into Thornton's car hit and shattered the car's windows, gunshot residue could have fallen onto Thornton's hands.

which Thornton himself left around midnight. Desiree said her father was either sleeping in the car or with a friend that night, and that he had had a job about a year earlier in the area where he was killed.

Police remained in the vicinity of defendant's home after Thornton's killing. That afternoon, they saw a van and a car pull up to defendant's home. Almache got into the car, which was driven by Daniel Munoz (Daniel), defendant's brother. Police pulled the car over and found Almache wearing a body armor vest.

That same day, police searched the back house where defendant was living pursuant to a search warrant. They found an AK-47, outfitted with a loaded clip, hidden inside a television. Police also found ammunition of various types in dresser and kitchen drawers.

After the shooting, defendant went to his cousin's house in Norwalk. Defendant asked his cousin and her daughter, Stephanie Cardenas (Cardenas), to drive him to Tijuana. The authorities were able to connect defendant to the Cardenas family and to stop Cardenas and her mother as they were crossing the border back into the United States. With some assistance in Tijuana, law enforcement officers took defendant into custody at the United States border.

### *C. Defendant's Defense (and the Prosecution's Efforts to Undercut It)*

#### *1. Defendant's encounters with the unidentified Hispanic man*

Defendant testified at trial. He told the jury he did not recognize the Hispanic man who came onto his property on

August 9, two days before defendant shot Thornton. The man parked a green vehicle on the sidewalk and then opened the front gate on the property and walked to the back door of the main house, which he tried to open. Defendant asked the man what he was doing and told him to leave. The other man threw the first punch, starting the fight.

Defendant testified that after he retrieved the kitchen knife from the main house on the property and returned outside, the man still refused to leave. They resumed fighting and defendant stabbed the man when he "wildly swung the knife . . . ."[6] Defendant said after the man fell he went inside and told his sister to come with him to their grandparents' house a short distance away.[7]

---

[6] Detective Colin Braudrick (Detective Braudrick) interviewed defendant after his arrest. In telling Detective Braudrick about the fight, defendant stated he "could have finished [the other man] off" but did not want to "go down for murder" so "I was like fuck it, shank him once and let him be. So I let him be, you know what I mean." Defendant also told Detective Braudrick he stabbed the other man twice "[b]ecause the first time I shanked him, he wouldn't go down. He wouldn't go down. Like I gave him—I gave him the chance, you know what I mean, to leave, but he wouldn't leave, so I had to do it again." Defendant testified he thought the other man was "in the system" because of his tattoos, but the parties stipulated the blood found outside defendant's home did not register a match with any convicted felon.

[7] Defendant's sister testified that defendant did not return to their house after the fight and that she decided to go to her

Defendant testified that as he was leaving, the Hispanic man ran off and said: "You fuck[ed] up. I will be back and kill you and your family." Defendant and his sister both testified that the Hispanic man drove to their grandparents' house after the fight and parked in the middle of the street. Defendant testified the man threatened him again at that time, telling defendant he "fucked up" and "I'll be back."[8]

Defendant's neighbor Mendez testified she saw and heard at least portions of the fight. Mendez claimed not to remember telling the police what she heard defendant and the other man saying, but the prosecution presented evidence that when police interviewed Mendez after Thornton's death, she told them she heard defendant tell the other man that if he did not leave, defendant would hit him and kill him. The prosecution also presented evidence Mendez had said, in her prior interview, that defendant "always makes a ruckus in the street," "is always bothering people," "doesn't like it when someone comes onto this street," and "says that this area belongs to him, and that nobody can come in here . . . ." At trial, Mendez testified she did not remember making these statements. She said she did remember, however, telling police that defendant gave everyone "very dirty looks," and Mendez admitted she was "sometimes" afraid of him.

---

grandparents' house on her own about five minutes after defendant fled.

[8] On cross-examination, the prosecution established defendant testified at a prior court proceeding that the man threatened to come back but never said "you fucked up." Defendant's sister testified that when she heard the man threaten her brother, the man did not swear.

Defendant testified he saw the Hispanic man three more times over the next two days, August 10 and 11. On the morning of August 10, defendant saw the same Hispanic man turn his car onto defendant's block. Defendant told the jury that later the same day he bought an AK-47 rifle, a .357 Magnum, a bag full of different types of ammunition, and a bulletproof vest. The next morning, which was August 11, defendant was outside his grandparents' house when the man drove by, this time in a black car, and gave defendant "a sideways glance." Defendant claimed he saw the man again later in the afternoon while defendant was walking between his house and his grandparents' home. According to defendant, this time the Hispanic man was driving yet another car, this one white, and defendant said there appeared to be a second man reclined in the front passenger seat. Defendant said he saw the driver make a gesture as though he was "trying to reach for something" as he drove by.

Defendant's mother (Pena) and his cousin's daughter (Cardenas) both testified defendant told them he had fought with the Hispanic man, that the Hispanic man had threatened his life and had been following him, and that they were in danger.

*2. Defendant's shooting of Thornton*

Almache testified he went to defendant's house the evening before Thornton's killing because defendant lived near his girlfriend. Defendant testified he told Almache to spend the night because defendant did not want to leave his family unprotected while driving Almache home. Almache said defendant did not say why he wanted Almache to set his alarm for 4:30 a.m.

Defendant testified he ran outside after Almache's alarm sounded because he heard the door of the main house slam and a car start. He stated that as he was "watching [Pena] go safely," he saw the headlights of an unfamiliar white car parked down the street come on. The car had no license plates and it began driving slowly toward his house. Defendant could see two black men inside with both seats reclined. Defendant "kn[e]w . . . it wasn't the Hispanic guy," but he testified he was "well aware" of retaliation and believed "sometimes they probably send different people." Defendant claimed that as the car passed by him, he saw the driver pointing a gun at his mother's car, and defendant said he was "in fear for my life and my mother's . . . life."

The white car continued past his family's property and then made a u-turn, which brought it behind his mother's car, which was pulling into the street. According to defendant, when the white car again passed where he was standing and was behind his mother's car, he saw "gunfire from inside the vehicle" and could not tell whether it was aimed at him or his mother Pena. Defendant, who was about "15, 20 feet" from the white car, fired two rounds at the vehicle. He told the jury he did so because he saw "the two gunmen inside the car, and . . . gunfire" and felt like his and his mother's lives were in danger.[9]

---

[9] On cross-examination, defendant admitted he had not previously said that he saw gunfire—whether in police interviews or while testifying at a prior court proceeding. Instead, his account up until trial had only described seeing the driver pointing a gun. Cardenas testified defendant told her he shot at the car because Thornton had driven past his mother twice and defendant "thought" Thornton was going to pull a gun.

Pena also provided an account of what happened in the early morning hours on August 12 (the time of the shooting). She testified that defendant called her that morning to say he would walk her to her car, but she did not see him when she left for work. Pena was inside her car when she noticed a white vehicle on the other side of the street turn on its lights. She said she saw two black men wearing white shirts and white caps inside the other car. Pena further asserted she could see the person in the passenger seat holding "something black" down by his thigh. When the car made a quick u-turn, Pena "got nervous" and "stepped on it," accelerating quickly away. She did not hear gunshots or anything else, and she turned at the end of the street.

After shooting Thornton, defendant ran to the back of his family's property, toward the railroad tracks. Almache said defendant saw him and told him to "shush," putting his finger to his mouth, as he ran by. Defendant told the jury he did not return to his house and that he tossed the gun by the railroad tracks, but Cardenas testified defendant told her he put the gun back in his house after the shooting.[10]

---

Both Almache and Johnny Green, a fire captain stationed near defendant's home, testified they heard only two gunshots shortly after 4:30 a.m. that morning. (That testimony tended to undermine defendant's claim to have seen shots fired from the white car because defendant admitted he fired two shots at Thornton, which would have accounted for the two shots Almache and Captain Green heard.)

[10] Detective Braudrick testified that Almache told him during an interview that he took a revolver from defendant's house and gave it to the driver of the van that accompanied the car driven

While defendant was at Cardenas's house later in the day after shooting Thornton, she walked with him to a pay phone twice. He made at least two calls to Almache. During those calls, defendant told Almache he "caught that fool slipping," which Almache said meant he "caught him off guard." Defendant also said he "let him have it" and "blasted that fool," or something to that effect. Defendant told Almache to remain in the house, keep his "mouth shut," refrain from doing anything "stupid," and put on the bulletproof vest. Cardenas testified she heard defendant ask Almache whether he had hidden the guns.

Almache testified that defendant told him he was sending someone to pick him up, an account that was corroborated by Cardenas, who testified she heard defendant ask his brother Daniel to get Almache. Defendant, however, testified he never told Almache someone would be coming to pick him up.

*D. Closing Argument*

Defense counsel argued his client's encounters with the unidentified Hispanic man caused him to genuinely fear for his and his family's safety, in particular for his mother because she left for work in the dark each morning. Counsel contended the fear defendant felt was attributable to "adrenaline, that fight or flight" response when defendant saw the white Saturn, without any license plates and occupied by two men in reclined positions with "what he thinks is a gun," make a u-turn and pull behind Pena's car.

---

by defendant's brother when picking up Almache after the shooting.

The defense further argued the evidence showed defendant's belief that he needed to shoot Thornton was reasonable under the circumstances. Counsel suggested Thornton may have had nefarious intentions that morning, asking, for example, why someone would choose to sleep in his car in one of the most dangerous areas of Los Angeles. Defense counsel further argued that defendant's claim to have seen Thornton with a gun (or someone else in the car with a gun, because defendant claimed he saw a passenger) was corroborated by some other evidence: Thornton had residue on his hands consistent with having fired a weapon and a passenger could have fled with the gun, which would explain why the police never recovered a firearm. Counsel argued a reasonable person confronted with the same circumstances as defendant would have felt the same fear, even if mistaken that Thornton presented any actual danger.

The prosecution argued defendant committed first degree murder based on evidence he positioned himself with a loaded gun outside his house, waited until Thornton drove by, and then aimed and shot him. Counsel reminded the jury of Mendez's testimony that defendant did not like people he did not know to be on "his" street and that defendant told the unidentified Hispanic man to leave or defendant would beat or kill him.

The prosecution additionally argued defendant did not act in self-defense because a reasonable person would not have believed, under the circumstances, that deadly force was necessary to prevent Thornton from killing or seriously injuring defendant or his mother. In the prosecution's view, defendant's accounts of the prior fight with the Hispanic man, the shooting,

and his fear were all implausible given other evidence, and the prosecution further argued that Pena lied to protect her son.

More specifically, the prosecution contended the shattered glass covering the passenger-side seats in Thornton's vehicle undercut the testimony of defendant and Pena that two people were in the car (the reasoning being that the glass would have fallen on the passenger, not the seat). The prosecution argued there was no evidence Thornton had or fired a gun, and defendant only claimed he saw gunfire after he saw a copy of the gunshot residue report (which was, in any event, consistent with Thornton receiving trace particles from the bullets defendant fired). The prosecution reminded the jury of defendant's statement to Almache that he "caught that fool slipping" and defendant's statement to Braudrick that he "let [the unidentified Hispanic man] leave." What the evidence showed, according to the prosecution, was that defendant shot "an unarmed black man in a car with no license plates, oh, and by the way with the windows rolled up" a few days after getting into a fight that defendant "brought on [him]self."

### *E. Jury Instructions*

The court instructed the jury after closing argument. The court gave a number of CALJIC instructions bearing on self-defense and the defense of others.

Among the instructions given was CALJIC No. 5.12, which informed the jury that killing another person is not unlawful when the person who does the killing actually and reasonably believes there is imminent danger he will be killed or greatly injured by another person and it is accordingly necessary to use deadly force. In addition, the trial court instructed the jury with

CALJIC Nos. 5.13 and 5.14, which explained this self-defense principle also applies when a killing is undertaken in defense of another person under the same conditions—and that "a person may act upon appearances whether the danger is real or merely apparent" (CALJIC No. 5.13). Also among the instructions given was CALJIC No. 5.17, which explained the concept of imperfect self-defense (or imperfect defense of another), namely, that a person who kills another "in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, kills unlawfully but . . . is not guilty of murder." Instead, the killing is punishable (at most) as voluntary manslaughter.

The court did not specifically instruct the jury they could consider defendant's prior encounters with the Hispanic man, and the threats that man was said to have made, in deciding whether defendant acted in self-defense or defense of his mother. Defense counsel stated on the record he had no objections to any of the instructions the court gave, and counsel did not request any clarifications or additions to the court's instructions.[11]

---

[11] In the prior trial, the trial judge gave modified instructions that highlighted how the jury could consider the antecedent threats made by the Hispanic man in considering whether defendant acted in (perfect or imperfect) self-defense or defense of his mother. So far as the appellate record reveals, defense counsel made no request for similarly modified instructions during the retrial.

## II. DISCUSSION

Defendant contends the trial court's exclusion of an expert witness he sought to have testify, as well as certain asserted instructional errors, eviscerated the crux of his defense to the murder charge. He argues the trial court should have allowed the expert to testify about "fight or flight syndrome" and his counsel should have requested, or the court should have given sua sponte, instructions on the relevance of the antecedent threats the Hispanic man was alleged to have made. Defendant further argues the court should have instructed the jury on voluntary manslaughter based on a heat of passion theory and there was insufficient evidence for the jury to find he committed willful, deliberate, and premeditated murder. In addition, defendant now contends a remand is required to give the trial court an opportunity to exercise discretion—recently conferred by the enactment of Senate Bill 620—to strike a section 12022.53 firearm enhancement that required the court at the time of sentencing to impose an additional term of 25 years to life.

We conclude the case should be remanded to give the trial court an opportunity to exercise its discretion to strike the firearm enhancement, but we reject his other contentions and affirm his convictions. As to defendant's claim the trial court erred by excluding expert testimony on fight or flight syndrome, we conclude defendant suffered no prejudice requiring reversal. Before trial, the defense argued the expert would permit the jury to make an inference that would explain why defendant shot a man seemingly engaged in innocent (or merely suspicious) conduct in purported self-defense or defense of others, but defendant's testimony at trial rendered this proposed expert testimony superfluous—defendant testified he shot Thornton

after seeing him point and seemingly fire a gun at Pena, and the jury needed no assistance in understanding why those circumstances, if true, would permit actions in self-defense or defense of others. Defendant's claims of instructional error fail because the court's instructions were accurate and adequate, obviating any requirement for a pinpoint instruction on antecedent threats or for an instruction on heat of passion manslaughter as a lesser included offense of murder. And as to the sufficiency of the evidence to support the jury's premeditation and deliberation finding, our standard of review is deferential and we conclude the finding is supported by adequate evidence of planning, motive, and the manner of killing.

*A. Claim of Wrongful Exclusion of Expert Testimony*

*1. The pertinent proceedings in the trial court*

Defendant's trial brief alerted the court and the prosecution that he intended to present evidence that defendant killed Thornton in self-defense or in defense of others (i.e., Pena). Specifically, the defense stated it planned to call expert witness Jack Rothberg (Rothberg), a medical doctor with a Ph.D., who would explain "the effects of the 'fight or [flight]' mechanism on a person's brain, demeanor and aggression." The trial brief elaborated as follows: "Since Defendant had been attacked and threatened in his own home [by the unidentified Hispanic man], he was concerned for not only his own safety but that of his family as well. That when he saw [Thornton's] car acting in a suspicious manner, Defendant acted while under the effects of the 'fight or flight' syndrome."

Prior to the commencement of trial, the trial court discussed evidence admissibility issues—including Rothberg's

proposed testimony—with counsel for both sides. Defense counsel made a further proffer of what Rothberg would (and would not) testify to and why it was relevant to the self-defense and defense of others theories he planned to present.[12] Counsel acknowledged "this notion of the fight or flight syndrome . . . is not a novel concept, and we all have some awareness of it and what it means." But defense counsel contended expert testimony could be appropriate even when jurors are not wholly ignorant about the subject of the testimony, and Rothberg's testimony was necessary "to answer that question, how does Mr. Thornton get shot when he seemingly poses no threat."

Counsel stated Rothberg would explain "the biology" of why the body responds the way it does to fight or flight syndrome, i.e., "that cognitive thinking of making a rational decision gets diminished" and "the senses of sight and hearing get heightened." Rothberg would additionally opine defendant suffered from post traumatic stress disorder (PTSD), which made him "more sensitive to the fight or flight syndrome, meaning [the syndrome might] come on more quickly with less stimulus than, say, someone who isn't suffering from PTSD." Counsel made clear, however, that "this expert is not going to testify to the ultimate issue as to whether [defendant] was under the influence . . . of this fight or flight syndrome, so to speak. That's up to the jury to

---

[12] Counsel agreed when asked whether the proposed testimony from Rothberg was offered in connection with the subjective aspect of self-defense (or defense of others) that was relevant to whether defendant acted either in actual or imperfect self-defense.

decide. But what Dr. Rothberg can do is explain the why of the fight or flight, [the] biology of the fight or flight."

The prosecution opposed the defense request to call Rothberg to testify, contending his proposed testimony was irrelevant because there was no evidence of any link between the Hispanic man who allegedly threatened defendant and the victim, Thornton. The prosecution also contended that without any association between the Hispanic man and Thornton, allowing the expert to testify would confuse the issues and be unduly prejudicial. The prosecution further argued that because Rothberg met defendant only once and did not review any records or interview any family members, his opinion that defendant suffered from PTSD was not supported by an adequate foundation.

The trial court ruled Rothberg would not be permitted to testify. The court explained that "based upon the offers of proof that I have heard, and based upon the recent [*People v. Romero* (1999) 69 Cal.App.4th 846 (*Romero*)] case, [the court does not] find that [Rothberg] could offer relevant testimony [on] the issue of perfect or imperfect self-defense, whether it's the objective standard or actual self-defense or the subjective standard, as to both."[13]

---

[13] The trial court reasoned that *Romero*, which neither party had cited in arguing the issue, was "very similar, [and] on point." As the court described it, *Romero* held that expert testimony on "'the sociology of poverty and the role of honor, paternalism and street fighters'" in "'the Hispanic culture'" was irrelevant to "'whether [the] defendant actually believed he was in [imm]inent danger of death or great bodily injury, and whether such belief is

*2. Analysis on appeal*

A trial court has broad discretion to exclude evidence, including expert testimony, if it determines the evidence is irrelevant (Evid. Code, § 350) or, despite being relevant, the evidence's "probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury" (Evid. Code, § 352). (*People v. Linton* (2013) 56 Cal.4th 1146, 1181; *People v. Harris* (2005) 37 Cal.4th 310, 337.)

The defense sought to call Rothberg as an expert witness in an effort to establish the killing of Thornton was not murder. The defense sought to convince the jury that defendant's decision to shoot Thornton was a lawful act of self-defense (perfect self-defense) or, at most, voluntary manslaughter (imperfect self-defense).[14] (See, e.g., *People v. Sotelo-Urena* (2016) 4 Cal.App.5th

---

objectively reasonable.'" Quoting in part from *Romero*, the court continued: "Whether a person should or should not retreat from a street fight, which is very similar to whether a person should or should not retreat, period, or stay and fight, has no bearing on whether that person may lawfully use deadly force. [¶] . . . Absent evidence that . . . defendant was in fear of [imm]inent death or great bodily injury, the jury has no evidentiary basis to conclude that the defendant subjectively had an actual but unreasonable fear that negated malice."

[14] Defendant did not argue in the trial court, nor does he argue on appeal, that Rothberg's testimony was offered to negate the prosecution's proof that defendant's shooting of Thornton was willful, deliberate, and premeditated—a finding the jury made in convicting defendant of first degree murder.

732, 744 ["A homicide is considered justified as self-defense where the defendant actually and reasonably believed the use of deadly force was necessary to defend himself from imminent threat of death or great bodily injury. Under such circumstances, the killing is not a crime. [Citations.] Where the defendant kills while actually but *unreasonably* believing the use of deadly force was necessary, defendant is considered to have acted in imperfect self-defense. Imperfect self-defense is not a complete defense to a killing, but negates the malice element and reduces the offense to voluntary manslaughter"].)

During the pre-trial hearing when the trial court was required to decide whether Rothberg's testimony should be admitted for this purpose, the question was a fairly close one. Based on the testimonial proffer provided by the defense, there are cases that can be read to support the request to call Rothberg as an expert witness. (See, e.g., *People v. Humphrey* (1996) 13 Cal.4th 1073, 1088-1089 ["We simply hold that evidence of battered women's syndrome is generally *relevant* to the reasonableness, as well as the subjective existence, of defendant's belief in the need to defend, and, to the extent it is relevant, the jury may consider it in deciding both questions"] (*Humphrey*); *People v. Cortes* (2011) 192 Cal.App.4th 873, 911-912 [expert testimony, similar to expert testimony in *Humphrey* that concerned the defendants' experiences as battered women that affected their perceptions of danger and its imminence, wrongly excluded].) There are also cases that point in the opposite direction, including, on the facts here, the very same *Humphrey* decision. (See, e.g., *Humphrey*, *supra*, at p. 1087 ["The jury must consider defendant's situation and knowledge, which makes the evidence relevant, but the ultimate question is whether a

reasonable *person*, not a reasonable battered woman, would believe in the need to kill to prevent imminent harm"]; *People v. Jefferson* (2004) 119 Cal.App.4th 508, 518-519 [no error in excluding evidence of the defendant's mental condition because "[t]he issue is not whether [the] defendant, or a person like him, had reasonable grounds for believing he was in danger" but "whether a 'reasonable person' in defendant's situation, seeing and knowing the same facts, would be justified in believing he was in imminent danger of bodily harm"]; see also *People v. Elmore* (2014) 59 Cal.4th 121, 137 ["Unreasonable self-defense was never intended to encompass reactions to threats that exist only in the defendant's mind"].) Regardless, as the case reaches us on appeal—after a full trial during which defendant testified—we are convinced there was no prejudicial error under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).[15]

Defense counsel stated Rothberg's proposed testimony was being offered so the jury could make a defense-favorable inference as to why defendant shot Thornton under circumstances in which he seemingly posed no threat. As counsel explained when arguing the issue at the pre-trial hearing: "[Defendant] shot . . . and ended up killing [Thornton] is the reason why we're here, and it's based on the actions as perceived by [defendant] on

---

[15] *Watson's* standard for prejudicial error applies because the exclusion of Rothberg's testimony did not amount to "a complete preclusion of a defense" warranting review under the standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24. (*People v. Bacon* (2010) 50 Cal.4th 1082, 1104, fn. 4; see also *People v. Fudge* (1994) 7 Cal.4th 1075, 1103 [rejection of a portion, but not the entirety, of evidence regarding a defense subject to *Watson* standard of review].)

the night he fired upon [Thornton]. It appeared threatening. It appeared as though he was coming after his mother. And that's what an expert can explain is, well, how can [defendant]—exact question that the prosecutor brings up, well, what did [defendant] ever know about [Thornton]? What did [Thornton] ever do to [defendant]? . . . Nothing. And so that explains why we need this expert to explain why [defendant] perceived [Thornton] as a threat." However, when defendant testified during trial, his account of what prompted him to shoot Thornton changed (or, perhaps, evolved) and rendered Rothberg's proposed testimony inconsequential.

Defendant testified he saw Thornton (whom he described as "the driver") pointing a gun at his mother's vehicle as Thornton's car drove by where defendant was standing. Defendant further testified that he saw "gunfire from inside [Thornton's] vehicle" and that's when he "returned fire." In light of this testimony, the predicate for a self-defense or defense of others defense was obvious and in no way depended on the need for expert testimony to explain why defendant would have understood the circumstances he described as threatening. Any juror would understand, in light of the self-defense and defense of others instructions given by the trial court, that deadly force could be an appropriate response by defendant if Thornton (or someone in his car) was shooting at his mother—Rothberg's testimony would have added very little to explain, as defense counsel put it, "why [defendant] perceived [Thornton] as a threat." (Evid. Code, § 801, subd. (a); *People v. McDowell* (2012) 54 Cal.4th 395, 425-426 [expert testimony admissible only if it is related to a subject that is sufficiently beyond common experience such that the testimony would assist the trier of fact].) The

question really came down to whether the jury believed defendant's testimony (it didn't), and it is not reasonably probable the jury would have come to a different conclusion if Rothberg had testified.

*B. Claims Concerning Instructional Error*

*1. The trial court was not required to give an instruction on antecedent threats sua sponte*

A trial court is obligated "to instruct sua sponte 'on those general principles of law that are closely and openly connected with the facts before the court and necessary for the jury's understanding of the case.' [Citation.]" (*People v. Simon* (2016) 1 Cal.5th 98, 143 (*Simon*).) Instructions that "relate particular facts to a legal issue in the case or 'pinpoint' the crux of a defendant's case" must be given if requested and supported by the evidence, but need not be given sua sponte. (*People v. Saille* (1991) 54 Cal.3d 1103, 1119.)

The Fifth District Court of Appeal held in *People v. Garvin* (2003) 110 Cal.App.4th 484, 489 (*Garvin*) that an instruction on the effect of antecedent assaults on the reasonableness of asserted self-defense conduct is "analogous to a clarifying instruction" and therefore a "'specific point'" rather than a "general principle of law." (*Ibid.*) Accordingly, the trial court in that case had no duty to provide such an instruction absent a request. (*Ibid.*)

The *Garvin* holding is persuasive and its application here is borne out by the defense's presentation of its case. The essence of the defense was that the threats by the unidentified Hispanic man contributed to defendant's asserted belief that he needed to shoot Thornton to protect himself and his mother. As defendant

states in his reply brief, "the antecedent threats defense was relied upon and argued vigorously to the jury." In his closing argument, defense counsel asked, "[w]ould a reasonable person who is beat up and threatened and saw the guy again and was going out watching his mom, would a reasonable person have felt that fear [when seeing Thornton's vehicle] too? I submit yeah. Who wouldn't?" Later, defense counsel again argued defendant acted from a fear caused by his earlier encounters: "And you have heard that time and time again in this trial from [defendant], from his family, from Detective Braudrick . . . . He had the fight. The threat that caused fear, but what really caused it was seeing [the Hispanic man] again and again and again so much so that he acquired weapons to do it. [¶] And why? Not so much for himself, for his mother. Is that so unreasonable? I submit to you it is [not]. Again, he is not going out there at 4:30 in the morning killing people, shooting at people. [¶] . . . [¶] So why is he doing it this time? Because he is scared. He is afraid for his mother. Why? The fight and the threat and the subsequent sightings of this guy."

The court's instructions on self-defense and defense of others permitted jurors to make the very connection defense counsel advocated. CALJIC No. 5.12 instructed that defendant was justified in killing Thornton if "the circumstances [were] such as would excite the fears of a reasonable person placed in a similar position . . . ." CALJIC No. 5.13 instructed that defendant could act upon appearances whether the danger was real or apparent, an instruction reiterated by CALJIC No. 5.51, which provided that "[a]ctual danger [was] not necessary to justify self-defense" so long as "a reasonable person in a like situation, seeing and knowing the same facts, would be justified

in believing himself in like danger . . . whether the danger is real or merely apparent."

Both the court's instructions and the arguments of defense counsel reveal that the effect of the threats and conduct of the unidentified Hispanic man on defendant's mindset when he shot Thornton was not a "general principle" of law but rather a specific application of the law of self-defense to the particular facts of this case. The jury could easily comprehend how and why the prior threats might have informed defendant's subsequent thoughts and actions, and nothing in the court's instructions foreclosed the jury from considering that relationship. Thus, a sua sponte antecedent threats instruction was not necessary for the jury to understand the defense theory or to correctly apply the law to the facts.

*2. Defendant has not established his trial attorney provided constitutionally deficient representation by not requesting an antecedent threats instruction*

Defendant contends that if we conclude a sua sponte instruction on antecedent threats was not required (and we have so concluded), his attorney was constitutionally ineffective because he did not request the instruction, which was "the centerpiece of the defense." Defendant avers there was no possible tactical reason for counsel not to request an antecedent threats instruction because "[i]t was appellant's only defense and was repeatedly stressed in argument." Furthermore, defendant argues his attorney's failure to request an antecedent threats instruction was prejudicial because such an instruction was given in the first trial, and that trial resulted in a hung jury.

"'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 694 [ ]; *People v. Ledesma* (1987) 43 Cal.3d 171, 217 [ ].)'" (*People v. Carter* (2005) 36 Cal.4th 1114, 1189.) We presume that "'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel.'" (*Ibid.*) If the appellate record "'sheds no light on why counsel acted or failed to act . . .,'" a reviewing court on direct appeal must reject an ineffective assistance of counsel claim "'unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation.'" (*Ibid*; see also *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

Under this standard for ineffective assistance of counsel claims brought on direct appeal, we see no error requiring reversal. As we have already explained, an antecedent threats instruction was unnecessary in light of the adequacy of the jury instructions given and the evidence and argument presented concerning antecedent threats as the motivation for defendant's behavior. Indeed, defense counsel may have chosen not to request a pinpoint instruction because he concluded it was unnecessary. Or counsel may have made a tactical decision to refrain from requesting such an instruction so as not to place overwhelming emphasis on the prior fight with the Hispanic

man, which might detract from defendant's testimony that he saw gunfire coming from Thornton's car after Thornton pointed a gun at his mother's vehicle.

In any event, counsel's failure to request an antecedent threats instruction did not prejudice defendant. The absence of such an instruction was not so significant that we can assume it may have influenced the jury. In that respect, this case is unlike *People v. Diaz* (2014) 227 Cal.App.4th 362, in which "highly inflammatory" evidence with "near certain potential for undue prejudice and . . . marginal probative value" was admitted at the defendant's second trial after his first trial resulted in a hung jury. (*Id.* at pp. 381-382; see also *id.* at pp. 384-385 [indications that the jury saw the case as "close" made it more likely defendant was prejudiced by introduction of the inflammatory evidence].) By contrast, the instructions given in this case, combined with defense counsel's presentation of evidence and argument (with no objection from the prosecution), adequately informed the jury they could consider defendant's previous encounters with the unidentified Hispanic man in deciding whether defendant actually believed he and his mother were in danger and whether that belief was reasonable. (*People v. Smithey* (1999) 20 Cal.4th 936, 986-987 [counsel's failure to request pinpoint instruction not prejudicial because the instructions as a whole, taken together with trial evidence and counsel's closing argument, adequately informed the jury they could consider evidence in the very manner that a pinpoint instruction would have provided].)

*3. The trial court did not err, prejudicially or otherwise, by not instructing the jury on heat of passion manslaughter*

A defendant who kills (1) in a sudden quarrel or heat of passion or (2) when motivated by an unreasonable but good faith belief in having to act in self-defense lacks the malice required for murder and therefore can be guilty of only voluntary manslaughter. (*People v. Breverman* (1988) 19 Cal.4th 142, 154.) These two forms of voluntary manslaughter are lesser included offenses of intentional murder. (*Ibid.*) "A trial court has a sua sponte duty to instruct the jury on a lesser included uncharged offense if there is substantial evidence that would absolve the defendant from guilt of the greater, but not the lesser, offense. [Citation.] Substantial evidence is evidence from which a jury could conclude beyond a reasonable doubt that the lesser offense was committed. [Citations.] Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on a lesser included offense. [Citations.]" (*Simon*, *supra*, 1 Cal.5th at p. 132; accord, *People v. Moye* (2009) 47 Cal.4th 537, 553 (*Moye*).)

Here, the trial court instructed the jury on voluntary manslaughter based on imperfect self-defense, but not on a heat of passion theory. Defendant argues this was error, reasoning defendant "acted out of a high-wrought emotion" when "he was in fear for the life of his mother when he saw Thornton point and fire a gun." We conclude no heat of passion voluntary manslaughter instruction was required because there was insubstantial evidence defendant shot Thornton in a heat of passion.

"[T]o warrant instructions on provocation and heat of passion, there must be substantial evidence in the trial record to support a finding that, at the time of the killing, defendant's reason was (1) actually obscured as a result of a strong passion; (2) the passion was provoked by the victim's conduct; and (3) the provocation was sufficient to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection, and from this passion rather than from due deliberation or reflection." (*People v. Wright* (2015) 242 Cal.App.4th 1461, 1481; see also *People v. Landry* (2016) 2 Cal.5th 52, 97.)

Here, defendant's trial testimony does not rise to the level of substantial evidence his reason was actually overcome by any intense emotion when he shot at Thornton's car (other than perhaps his asserted fear, which was covered in the self-defense and unreasonable self-defense instructions the trial court gave).[16] The trial court accordingly had no duty to give a lesser included offense instruction on heat of passion manslaughter. (*Moye*, *supra*, 47 Cal.4th at p. 553-554 [trial court that gave instructions on imperfect self-defense voluntary manslaughter did not err in declining to also instruct on heat of passion voluntary manslaughter because even though the defendant testified at one point he was "not 'in the right state of mind'" when attacking the

---

[16] Defendant, for example, testified at one point on direct examination that the evening before the shooting he did not get drunk or use drugs because that "clouds your mind and you don't think rational. [I] wanted to be conscious and be aware of everything that was going on."

victim, the "thrust" of the defendant's testimony was self-defense, not a heat of passion killing].)

Moreover, even if we were to conclude the trial court should have instructed the jury on a heat of passion theory of voluntary manslaughter, the omission of the instruction was harmless under any standard of assessing prejudice. The jury's rejection of voluntary manslaughter based on unreasonable self-defense, which was predicated on facts essentially identical to those upon which defendant relies to argue a heat of passion manslaughter instruction was required,[17] proves beyond a reasonable doubt that the jury would have returned a murder verdict even if instructed on heat of passion voluntary manslaughter.

### C. *Claim of Insufficient Evidence*

Defendant contends there was insufficient evidence for the jury to find he committed willful, deliberate, and premeditated murder. His contention is without merit for reasons we now explain.

"In assessing the sufficiency of the evidence supporting a jury's finding of premeditated and deliberate murder, a reviewing court considers the entire record in the light most favorable to the judgment below to determine whether it contains substantial evidence—that is, evidence which is reasonable, credible, and of solid value—from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] When the circumstances reasonably justify the jury's findings, a

---

[17] As defendant concedes in his opening brief, "the theories of imperfect self-defense and heat-of-passion voluntary manslaughter were closely intertwined . . . ."

reviewing court's opinion that the circumstances might also be reasonably reconciled with contrary findings does not warrant reversal of the judgment. [Citations.]" (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1068-1069 (*Mendoza*).) Thus, we approach our task without reweighing the evidence or reevaluating the credibility of witnesses. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)

To support a conviction for deliberate and premeditated first degree murder, there must be sufficient evidence the defendant carefully weighed considerations in choosing a course of action and thought about his conduct in advance. (*People v. Cage* (2015) 62 Cal.4th 256, 276 (*Cage*).) "'""The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ."'" [Citation.]" (*Ibid.*)

Relying on the seminal decision in *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*), courts generally look for three types of evidence in evaluating whether a defendant premeditated and deliberated: planning activity, motive, and the manner of killing. (*Cage*, *supra*, 62 Cal.4th at p. 276.) "When evidence of all three categories is not present, 'we require either very strong evidence of planning, or some evidence of motive in conjunction with planning or a deliberate manner of killing.' [Citation.] But these categories of evidence . . . 'are descriptive, not normative.' [Citation.] They are simply an 'aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere

unconsidered or rash impulse.' [Citation.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1224.)

Considering the record in light of the *Anderson* factors, we conclude there was sufficient evidence defendant killed Thornton with premeditation and deliberation. Defendant's own testimony revealed he engaged in significant planning activity. Prior to the killing, he purchased multiple guns, ammunition, and body armor; hid one of the weapons; and positioned himself, armed, behind the front gate of his home early in the morning before Thornton drove by. Such conduct in no way reflects a rash or unconsidered decision.

In addition, the statements of defendant's neighbor Mendez provided a basis on which a jury could infer a nefarious motive for the killing. She told police defendant did not approve of unfamiliar people coming onto their street and defendant said the area "belong[ed] to him . . . ." Other evidence at trial tended to bear this out: Mendez heard defendant threaten to kill the unidentified Hispanic man if he did not leave, defendant harassed a man he did not know parked on the street, and defendant assaulted Smith close to his home. There was also evidence defendant was an 18th Street gang member and particularly hostile to African-Americans. He had "BK" for "Blood killer" tattooed on his body, and both Smith and Thornton were African-American.[18]

Defendant's manner of killing Thornton, with a shot to the head, from a concealed position on his property 15 to 20 feet away

---

[18] The prosecution's gang expert testified that gang tattoos had to be "earned" and one could not get a "Blood killer" tattoo unless one had actually killed a Blood.

from Thornton's vehicle, was further evidence that supported the jury's first degree murder finding. (See *Mendoza, supra*, 52 Cal.4th at p. 1071 ["Because the manner of killing reflected stealth and precision, a rational jury could conclude that a preconceived design was behind the killing"].)

Additional evidence supports a finding of first degree murder insofar as it undermines defendant's claims to have acted impulsively out of fear. Defendant told Almache after killing Thornton that defendant "let him have it" and "caught that fool slipping." These statements suggest that if anyone was planning an ambush that morning, it was defendant, not Thornton.

*D. Cumulative Error*

Defendant contends that even if the effect of the asserted errors in this case are not prejudicial when considered individually, the cumulative effect of those errors requires reversal of his murder conviction. We have either rejected defendant's contentions of error or held any assumed errors to be harmless. Defendant's cumulative error claim therefore fails. (*People v. Sapp* (2003) 31 Cal.4th 240, 316.)

*E. Senate Bill 620*

The trial court sentenced defendant, as required under then-governing law, to 75 years to life in prison. This sentence was partly composed of a consecutive 25-years-to-life prison term

for the jury's true findings on the alleged section 12022.53 enhancements.[19]

After defendant's sentencing—and indeed, after our prior decision affirming the judgment—Senate Bill No. 620 took effect. (Sen. Bill No. 620 (2017-2018 Reg. Sess.) [effective January 1, 2018].) Senate Bill 620 amended section 12022.53 to give trial courts discretion, in the interest of justice, to strike a firearm enhancement finding made under the statute. (§ 12022.53, subd. (h), as amended by Stats. 2017, ch. 682, § 2 ["The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section"].)

Defendant contends we should remand the case to the trial court so it may exercise its newly conferred discretion under section 12022.53, subdivision (h). The Attorney General argues a remand would serve no purpose because the trial court's sentencing decisions (imposing consecutive sentences for defendant's murder and assault convictions and finding no

---

[19] The jury found true three allegations relating to defendant's use of a firearm—that he personally and intentionally discharged a handgun causing Thornton's death within the meaning of section 12022.53, subdivision (d), he personally and intentionally discharged a handgun within the meaning of section 12022.53, subdivision (c), and he personally used a handgun within the meaning of section 12022.53, subdivision (b). Section 12022.53, subdivision (f) provides that if multiple section 12022.53 firearm enhancements are found true, the court shall impose just one enhancement—that with the longest term of imprisonment. That is what the trial court did here.

mitigating factors to justify imposition of a low term sentence for assault or the gang enhancement) sufficiently indicate the court would not exercise its discretion to strike the firearm enhancements.

On this record, we agree with defendant. To be sure, the trial court declined to run defendant's sentences for murder and assault concurrently, but the court explained it was imposing consecutive sentences because "the crimes occurred at different dates and places with different intents." The trial court did, on the other hand, exercise its discretion to impose middle term sentences for defendant's assault conviction and the gang enhancement. The court did not, therefore, impose the maximum sentence possible (despite recommendations that it do so by the district attorney and the probation department), nor did the court make any statements revealing how it would sentence defendant if it were given additional discretion. A remand is therefore appropriate because the record provides no "clear indication" that the trial court would decline to exercise its recently conferred discretion to reduce defendant's sentence. (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 423.)

## DISPOSITION

Defendant's convictions are affirmed. The matter is remanded to the trial court for further proceedings consistent with this opinion.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, Acting P.J.

We concur:

MOOR, J.

KIN, J.*

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.